E-FILED
Monday, 19 November, 2018  11:57:16 PM
Clerk, U.S. District Court, ILCD

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### URBANA DIVISION

| | | |
|---|---|---|
| RUSSELL HOEKSTRA, | ) | JURY DEMANDED |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 2:17-CV-02040 |
| | ) | |
| CITY OF MOMENCE, | ) | U.S. District Judge Colin S. Bruce |
| and JEFFREY CAVENDER, in his official | ) | |
| and individual capacities, | ) | U.S. Magistrate Judge Eric I. Long |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR SUMMARY JUDGMENT

NOW COMES plaintiff RUSSELL HOEKSTRA respectfully submits this Response to Defendants' Motion for Summary Judgment[1] and states as follows:

After Defendants Momence Police Chief Jeffrey Cavender ("Cavender") and the City of Momence ("Momence") terminated his employment as a full time Momence police department ("MPD") officer, plaintiff Russell Hoekstra ("Hoekstra") filed his EEOC charge and upon receipt of a right to sue letter filed his complaint in which he alleges that Defendants discriminated against him on the basis of his age (Count I, ADEA against Momence); age (Count II, 14th Amendment against Momence); age (Count III, 14th Amendment against Momence and Cavender in his official capacity); age (Count IV, 14th Amendment against Cavender in his individual capacity); retaliatory termination (Count V against Momence); defamation (Count VI and Cavender); and Title VII and

---

[1] Hoekstra's Response to the Defendants' Rule 56.1 is separately attached.  Hoekstra's Responses to Defendants' Statement of alleged Uncontested Facts is referred to as "RDF". Hoekstra's Additional Facts are referred to as "PAF."

ADEA retaliation (Count VII against Momence).[2]   Defendants have moved for summary judgment.  Plaintiff asks the court to deny Defendants' motion for summary judgment.

## SUMMARY

Immediately on the date of his fire as Momence Police Chief on November 5, 2013, Jeffrey Cavender began a crusade to weed out and replace all experienced officers over 40 years of age with officers mostly in their 20's who had either experience or far less experience than any officer over 40.  His design was to create new police force in his perceived image.  While NEW hire applicants included employees over 40, all NEW hires were under 40 and mostly in their 20's.

Defendants' motion and case are best characterized as almost completely reliant upon hearsay and presumptuous conclusory deposition testimony of Cavender (the alleged seasoned former Momence police chief) and of former Momence Mayor Mickey Clayton Porter who hired Cavender.  The City has not proffered any declarant testimony nor taken the depositions of any current or former Momence police officer, other than Hoekstra, to support its defense.

When Chief Cavender gave Hoekstra his employment termination letter, it gave no reason.  Cavender testified at his deposition that Hoekstra was fired for allegedly lying in an investigation about an inappropriate photo posted by Momence Officer Garcia on Instagram. Cavender wrote to the Illinois Department of Employment Security ("IDES") to fight Hoekstra's claim for unemployment benefits.  He told the IDES Hoekstra was fired about the Garcia photo and three other reasons including [unproven] sleeping on the job.  Cavender testified at his deposition that Hoekstra was not fired for any of those other reasons.  Mayor Porter testified at his deposition that Cavender told him Hoekstra was fired for [unproven] sleeping on the job; nothing about allegedly lying during the Garcia photo investigation.

---

[2] See, Doc. # 34; May 8, 2017 Order Granting in Part and Denying in Part Defendants'' motion to Dismiss.

In all Cavender and City allegations of Hoekstra's alleged misconduct leading to his termination, Cavender and Porter rely exclusively upon hearsay. They also rely upon alleged proof from a squad car dashcam video / audio recording and an audio recording of officer witness statements. No such videos or audios have ever been produced. Indeed, during Cavender and Mayor Porter's depositions, Defendants' counsel and Porter regarding the dashcam video and Cavender regarding the witness audios conceded that the recordings were not produced and Cavender, Porter (and the City) do not know where they are located.

Cavender, the former allegedly seasoned police chief, also testified that he never took written officer witness statements. He also testified that he allegedly did take notes during those officer witness statements, that he does not have those notes and most likely threw them out.

Such rank incompetence underscores that the Defendants' alleged defenses are pretextual and establishes at this juncture that the alleged defenses have no proof or in the least that there exist substantial issues of material fact precluding summary judgement.

After Hoekstra's employment termination, he applied for unemployment. Cavender sent the Illinois Department of Employment Security ("IDES") a letter disputing the claim based upon charges that Hoekstra never heard about, and for which Cavender admits he was not fired.

After Hoekstra's employment termination, he applied for a job with the City of Grant Park Illinois. Cavender sent Grant Park a 30-page report of alleged misconduct by Hoekstra, and that he initiated a criminal investigation with the Illinois State Police about case evidence found in Hoekstra's locker. Cavender failed to report that doing so was a long-standing practice in Momence because they had no formal evidence lock-up. Grant Park put Hoekstar's application on hold. The State Police cleared Hoekstra of all Cavender allegations and he was charged with nothing. When he asked Grant Park whether he could get the job, he was told it had been filled.

After Hoekstra's employment termination and the above other matters, during a vehicle pursuit of a shooter suspect Cavender, via private cell phone call and text, withdrew Momence police units from backing up Officer Hoekstra, employed by Aroma Park Police Department in Kankakee County, in vehicle pursuit of a suspected shooter. Cavender did so in violation of Illinois police pursuit policies and without notification to Hoekstra and the pursuit supervisor. One of the unknown alleged for cause termination reason expressed to IDES was that Cavender's younger officers allegedly claimed that Hoekstra failed to promptly back them up, which Hoekstra had never been previously told for fired about. Cavender's vengeful retaliation put Hoekstra, other pursuit officers and the public at large at greater risk. Hoekstra filed a new EEOC charge against the City and Cavender for retaliation.

## STANDARD OF REVIEW

Defendants must demonstrate, through the pleadings and other record materials, such as depositions, answers to interrogatories, admissions, and affidavits that no genuine issue of material fact exists. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 – 23 (1986). The court must consider the record as a whole, in the light most favorable to the non-moving party, Hoekstra, and draw all reasonable inferences in his favor as the non-moving party. *Paluck v. Gooding Rubber Co*., 221 F 3d 1003, 1009 (7th Cir. 2000). "The standard is applied with added rigor in employment discrimination cases, where intent and credibility are crucial issues." *Robinson v. PPG Industries, Inc.* 23 F 3d 1159, 1162 (7th Cir. 1994).

## BACKGROUND

### Defendants Complaint Answers On Their Face Support Motion Denial

Defendants Answer to the Second Amended Complaint contains substantial admissions against interest and in support of denial of their motion for summary judgment.

Plaintiff, then age 47, is an employee within the meaning of the ADEA and belongs to the class of employees protected under that statute, namely employees over the age of forty (40). (Ex. N, Defts. Admit, Answer ¶ 9).  On or around June 24, 2004, Defendant City of Momence hired Plaintiff as a part-time patrolman with the Momence Police Department (MPD). Defendant City promoted Plaintiff to full-time patrolman on or around July 2, 2015. (Ex. N, Defts. Admit, Answer ¶ 10).

In or around November 2013, Defendant City hired Defendant Cavender as chief of police. At the time, the MPD employed approximately twelve patrolmen, seven of whom were over the age of forty. (Ex. N, Defts. Admit, Answer ¶ 11).

Twice Cavender required Plaintiff to attend report writing classes (Defts. Admit as to every officer, Answer ¶ 16).

A full-time position became available in May 2015, but instead of considering Plaintiff, Defendants hired Officer Ben Garcia, a 23-year old. (Ex. N, Defts. Admit, Answer ¶ 17).

Plaintiff had more experience in law enforcement and seniority as a part-time officer. (Ex. N, Defts. Admit, Answer ¶ 17).

Plaintiff was eventually promoted to a full-time patrolman on July 2, 2015, but that promotion was contingent on Plaintiff remaining on probation for one year (Ex. N, Defts. Admit, Answer ¶ 18),

In early summer 2015, while Cavender, Lieutenant Vekemans, and Officer-In-Charge Caliendo were not at work., Cavender placed in charge Officer Stetson, an officer with less than one year of experience instead of placing Plaintiff in charge. (Ex. N, Defts. Admit, Answer ¶ 21)

On September 21, 2015, City of Momence Alderwoman Carrie Navratil brought to Chief Cavender's attention an Instagram post made by Officer Garcia. (Ex. N, Defts. Admit, Answer ¶

22). In the photo, Garcia was in his MPD uniform and squad car holding up his service pistol. (Ex. N, Admit, Answer ¶ 22). Garcia added to the photo the aggressive caption "I am a sheep dog that hunts wolves at night, although they prey on the weak and defenseless, sheep beware, for I am out there waiting for you."  (Ex. N, Defts. Admit, Answer ¶ 22).

In response to this news, Cavender suspended Garcia for ten days for the breaking of multiple City regulations. (Ex. N, Defts. Admit, Answer ¶ 23).

Cavender also determined that it was necessary to find out how Navratil obtained the photograph. (Ex. N, Defts. Admit, Answer ¶ 24). Alderwoman Navratil stated that no one gave it to her, and that rather the photo was left in her mailbox. (Ex. N, Defts. Admit, Answer ¶ 24). Alderwoman Navratil stated that she did not know who put the picture in her mailbox. (Defts. Admit, Answer ¶ 24). Despite the fact that the photo was publicly accessible by anyone on the Instagram app, Cavender determined that the source of the photo must be someone in the MPD. (Ex. N, Defts. Admit, Answer ¶ 24).

After conducting an internal investigation, Cavender reported that employees stated that Plaintiff hated Garcia and wanted to give the pictures to the Navratil family.  (Ex. N, Defts. Admit, Answer ¶ 26).

Cavender also claimed that employees stated Plaintiff slept on the job.  (Ex. N, Defts. Admit, Answer ¶ 26).

In or around mid-September 2015, Cavender made unwarranted and false allegations regarding Plaintiff, including but not limited to that Plaintiff was asleep in his patrol car. Cavender put these allegations into his internal investigation report, in which at least one officer was misquoted as corroborating that Plaintiff ever slept on the job. (Ex. N, Defts. Admit, Answer ¶ 27).

On September 28, 2015, Cavender brought Plaintiff in for an interview about the internal investigation. In this interview Cavender asked Plaintiff about the social media policy, if Plaintiff had seen the photos of Officer Garcia, and whether or not Plaintiff discussed these photos with anyone or gave them to anyone including the Navratils.  (Ex. N, Defts. Admit, Answer ¶ 28).

Plaintiff stated that he had seen the photos, had not spoken of the photos to anyone else, and he did not provide the photos to the Navratils. (Ex. N, Defts. Admit, Answer ¶ 28).

At the end of the interview, Cavender told Plaintiff that throughout the investigation he had been brought some information and "obviously [he is] not happy about some of the things [he] learned." (Ex. N, Defts. Admit, Answer ¶ 29).

Cavender admitted after discussing with Plaintiff and some of the employees in the MPD outside the protected class, "somebody is not telling the truth here." (Ex. N, Defts. Admit, Answer ¶ 29).   As a result, Cavender decided that Plaintiff must not be telling the truth but offers no testimonial or any other evidence to support that challenge to Hoekstra's truthfulness.

Cavender told Plaintiff that he would either submit a resignation the next morning or be terminated. (Ex. N, Defts. Admit, Answer ¶ 29). No other reason was given for the termination.

Plaintiff did not tender his resignation. (Ex. N, Defts. Admit, Answer ¶ 30).

On September 29, 2015, the City terminated Plaintiff's employment. (Ex. N, Defts. Admit, Answer ¶ 31).

The termination letter sent by Cavender did not state a specific reason for Plaintiff's termination. (Ex. N, Defts. Admit, Answer ¶ 31).

Between November 13, 2013 and September 29, 2015, Defendant City, several patrolmen resigned, retired or were terminated. (Ex. N, Defts. Admit, Answer ¶ 32).

Defendants admit that on April 11, 2016, Chief Cavender wrote to the Illinois Department of Employment Security ("IDES") to protest unemployment benefits for Plaintiff since Plaintiff, who was a probationary employee, had been terminated for misconduct, including providing false and inaccurate statements during the course of an investigatory interview, violating several department policies regarding neglect of duty, sleeping on duty, dissemination of department information to non-department members, improper care, handling, reporting, and disposition of evidence from a criminal investigation, and that Plaintiff's lies during the internal investigation had compromised his integrity and caused irreparable harm to him, his profession, and the ability of the Momence Police Department to use Mr. Hoekstra as a government witness in court matters. (Defts. Admit, Answer ¶ 33).  Neither to the IDES nor to this court have the Defendnats provided any direct evidence to support th above contentions other than hearsay and suppositions.

At a city council meeting, Cavender stated, "only one officer [Hoekstra] slept while on duty and he no longer works here!" (Ex. N, Defts. Admit, Answer ¶ 35).

Upon information and belief, Defendants admit that on January 10, 2017, while working for the Village of Aroma Park Police Department in Kankakee County, Plaintiff decided to pursue and apprehend an armed alleged shooter who had allegedly already shot two individuals. (Ex. N, Defts. Admit, Answer ¶ 37).

Defendants admit that Chief Cavender contacted his two Momence police officers on their cell phones and ordered them to stand down unless the pursuit entered their jurisdiction, at which point they could re-evaluate the situation. (Ex. N, Defts. Admit, Answer ¶ 37).

## FACTS

1.      Jeffrey Cavender was hired as Momence police chief in December 2, 2013..  Mayor Porter was Momence's mayor the entire time that Cavender was the police chief. Cavender

resigned from Momence the same day that Mayor Steele was sworn in to replace Mayor Porter. Cavender submitted his resignation after he knew that Steele had been elected Mayor. (PAF 1).

2.     Cavender quit as police chief because Mayor Porter was not going to run for mayor again.    By the time the election campaigns came around, the two mayoral candidates, Mayor Steele and Steve Gross, had said they were going to go in a different direction and that it was possible that Cavender would not be re-hired.    Cavender quit as police chief on Mayor Porter's last day as Mayor. (PAF 2).

3.     Mayor Porter knows Russ Hoekstra as a nice guy..   He got along with Hoekstra. He had no reason on his own to cause Russ to be fired from the municipality. (PAF 3).

4.     Hoekstra received a letter of commendation from Chief Cavender dated August 14, 2014. (Exhibit D hereto). It was a form letter that he sent to all the officers that year. (PAF 4).

5.     During Chief Cavender's reign, there was really no supervisor on the street for many of the night shifts.  Chief Cavender and Lieutenant Vekemen were always on the day shift, Officer in Charge Caliendo. (PAF 5).

6.     Hoekstra has no recollection of criticizing Chief Cavender or the Momence Police Department to Deputy Chief Springer at Kankakee Community College.  (PAF 6)

7.     Prior to and between November 5, 2013 when Chief Cavender was hired and March 21, 2015 when Nolte resigned, in his capacity as a police officer Nolte worked with Momence police officer Russell Hoekstra in his capacity as a police officer and had many opportunities to work with officer Hoekstra and observe his police work including backing-up each other on traffic stops and handling criminal and civil complaints and working part-time off-duty security jobs. (PAF 7).

8.      At all times, Nolte found officer Hoekstra's police officer work to be at the top.  He was very diligent, professional, thorough and maintained a professional demeanor with the public-at-large.  He also maintained an appropriate demeanor with persons with whom he interacted and under the differing circumstances surrounding police matters. To my knowledge, officer Hoekstra was well-liked and respected in the community.   (PAF 8).

9.      While Novak was a Momence police officer, in his capacity as a police officer he worked with Momence police officer Russell Hoekstra in his capacity as a police officer and had many opportunities to observe his police work including backing-up each other on traffic stops and handling criminal and civil complaints.  (PAF 9).

10.     At all times, I found officer Hoekstra's police officer work to be diligent, professional, thorough and reasoned. He maintained a professional demeanor with the public-at-large. He maintained an appropriate demeanor with persons with whom he interacted and under the differing circumstances surrounding police matters. As a smaller-town police department, officers necessarily engage with the public-at-large more regularly and performing outside security part-time work and, in that regard, he was well-liked and respected in the community to my knowledge.  (PAF 10).

11.     Novak was aware that Officer Hoekstra was a military veteran and honorably discharged.  Novak was aware that he also worked for the Illinois Secretary of State as a civilian employee. (PAF 11).

12.     At the time of Hoekstra's employment termination, he was married with six children ages 20, 19, 17, 15, 14, and 12. Hoekstra had full-time income and medical benefits.  At the time of Hoekstra's firing he lost his income and his medical. (PAF 12).

13.     Cavender told Hoekstra to resign or be fired. Cavender notified the city board that Hoekstra was fired.  (PAF 13).

14.     Chief Cavender told Mayor Porter that Hoekstra was fired for impropriety--sleeping on the job.  Porter does not know of any other reason.. Cavender said the proof was that other officers were concerned with Hoekstra not being able to back them up. Porter did not talk to those officers.  (PAF 14).

15.     Mayor Porter does not recall seeing Hoekstra's termination letter. (PAF 15).

16.     Mayor Porter does not know whether Hoekstra was fired about the Garcia photos—"I don't recall what his termination letter was all about" except sleeping on the job and some case evidence photos found in Hoekstra's locker.  (PAF 16).

17.     Mayor Porter is not aware that Hoekstra was fired before anything was found in his locker and does recall hearing about that after Hoekstra was fired.  The photos allegedly in Hoekstra's locker probably had nothing to do with Hoekstra's termination.  (PAF 17).

18.     Chief Cavender's report indicates that Officer Stetson claimed that Hoekstra was working on the same shift as him that day and that Hoekstra failed to initially respond as a backup and that a Grant Park Police Officer Castillo arrived to assist him before Hoekstra ever arrived on the scene.  Hoekstra was on the same shift.  Hoekstra was on his own traffic stop at that time finishing that up before he could go to assist him.  (PAF 18).


19.     Hoekstra's investigatory interview with Chief Cavender had concluded on 3:00 p.m. September 2015.  Hoekstra received his employment termination letter from Chief Cavender on September 29, 2015 delivered in person by Lieutenant Vekemans to Hoekstra's house at approximately 8:00 a.m. When he handed it to Hoekstra, Lieutenant Vekemans said, "Well, you

kind of figured this was coming." While Hoekstra suspected that Chief Cavender was out for him as one of the two remining officers over 40, and whom he had not hired, Hoekstra did not at all expect that I would be fired because Officer Garcia posted the Instagram photo.  I was stunned but not totally surprised and in shock since Hoekstra has a wife and many children to support. Hoekstra was even more stunned and angry that he would fight his unemployment compensation claim.  (PAF 19).

20.     During a conversation with Deputy Chief Springer after Hoekstra was fired, Chief Springer told him that Chief Cavender fired him.  (PAF 20).

21.     Officer Todd Navratil once personally told Hoekstra that he better watch out because the chief is coming after me. (PAF 21).

22.     Mayor Porter testified that there was not a lot of turnover in the police department before Cavender was chief. There was more turnover under Cavender than had been previously. Cavender testified that other than part-time police Officer Tim Green, he cannot recall any police officers over 35 years of age when he left Momence, and that a majority were under 35. Cavender hired Officers Caliendo (age 30), Stetson (age 25) and Patzschke (age 22).   (PAF 1022

23.     During Cavender's tenure as Momence police chief, the Momence city board allowed nine full-time officers, including his chief position.    There were no restrictions on the number of part time officers.  The greatest number of part-time officers while he was chief fluctuated; when he was hired there were 12 or 13 part-time officers on the roster.  (PAF 23).

24.     Cavender testified incorrectly that when he started at Momence, there were only six full time officers, and that including himself there were only two full time over age 40, Lieutenant Tracy Nolte.  (PAF 24).

25.     Between November 5, 2013 when Cavender was hired and March 21, 2015 when Tracy Nolte resigned, Jeffrey Cavender was Nolte's police chief. (PAF 25).

26.     Nolte was 55 when he was forced to resign. (PAF 26).

27.     Nolte is aware that like himself, Todd Navrital, Roger Novak, Johnny Short and Russell Hoekstra were all over 40 years of age.  (PAF 27).

28.     Nolte had a heart attack and remained on the Momence payroll, but Momence would not allow him to return unless and until he was fully released for full-time duty without any accommodation.  (PAF 28).

29.     n March 2015, Chief Cavender called Nolte into the office and told him that he would be relieved of duty or he could resign.  Nolte resigned on March 21, 2015.  (PAF 29).

30.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015, Nolte was aware of or observed Chief Cavender interview many police candidates younger under 40, and over 40.  (PAF 30).

31.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015, Nolte was aware that all new officer hires by Chief Cavender were under 40 years of age, and that most were under 30.  Every new hire under 40 had far less years of experience, if any, than the then current officers over 40.  (PAF 31).

32.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015, Nolte was aware that all Momence officers over 40 years of age, Todd Navrital, Roger Novak, Johnny Short eventually resigned, retired or were fired by Chief Cavender and that we were replaced by officers under 40, and that Russell Hoekstra over 40 remained.  (PAF 32).

33.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015 when he was forced to resign, Nolte observed and heard Chief Cavender treat me and other

Momence officers over the age of 40, Todd Navrital, Roger Novak, Johnny Short and Russell Hoekstra, negatively as compared with newer and younger less experienced officer under the age of 40 whom Chief Cavender did not treat negatively including: Benjamin Garcia, Dominic Dimaggio, Joshua Malloy, Jacob Vekemans, Gabriel Caliendo, Alejandro Morfin, Joshua Rasmussan, and Brandon Miller.  (PAF 33).

34.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015 when Nolte was forced to resign, the older Momence officers over 40, Todd Navrital, Roger Novak, Johnny Short, Russell Hoekstra, and Nolte, were subjected to significantly more destructive and hostile treatment by Chief Cavender compared with younger less experienced Momence officers under the age of 40. (PAF 34).

35.     Between November 5, 2013 when Chief Cavender was hired and March 21, 2015 when  Nolte was forced to resign, he observed and heard Chief Cavender intimidate, severely criticize, ridicule, and micromanage older experienced Momence officers, Todd Navrital, Roger Novak, Johnny Short, Russell Hoekstra and Nolte about such matters as report writing and re-writing, whereas he did not engage in the same such conduct with younger less experienced Momence officers under the age of 40.  He was also more punitive to older experienced Momence officers, Todd Navrital, Roger Novak, Johnny Short and Russell Hoekstra and Nolte, compared with younger less experienced Momence officers under the age of 40.  (PAF 35).

36.     Hoekstra was constantly badgered about his report writing.  Between November 5, 2013 when Chief Cavender was hired and March 21, 2015 when Nolte resigned, Nolte testified that Chief Cavender constantly reprimanded the officers over 40 including me for our police report writing, including content, syntax and grammar.  Chief Cavender would order us to change and/or

rewrite our first-hand police reports for content, syntax and grammar, and not simply typos.  (PAF 36).

37.    Nolte challenged Chief Cavender that what he required officers to do regarding changing our initial written reports was very serious and risky because changing and rewriting the way we said something could be a testimony problem in court. Nolte told Chief Cavender that in my 20 years as an officer I never had a report get kicked back to me for changes and re-writing and that it was wrong for professional reasons. (PAF 37).

38.    Nolte was replaced by a younger person under 40, less or no experienced person. (PAF 38).

39.    Between November 5, 2013 when Cavender was hired and June 6, 2014 when Novak was fired by Chief Cavender, he was aware that, like himself, Todd Navrital, Tracy Nolte, Johnny Short and Russell Hoekstra were all over 40 years of age.  (PAF 39).

40.    Between November 5, 2013 when Cavender was hired and June 6, 2014 when Novak was fired by Chief Cavender, he was aware of and observed Chief Cavender interview many police candidates he is aware of or observed Chief Cavender interview many police candidates younger under 40, and over 40.  (PAF 40).

41.    Between November 5, 2013 when Cavender was hired and June 6, 2014 when Novak was fired by Chief Cavender, he was aware that all Momence officers over 40 years of age, Todd Navrital, Tracy Nolte, Johnny Short and Russell Hoekstra, eventually resigned, retired or were fired by Chief Cavender.  (PAF 41).

42.    Between November 5, 2013 when Cavender was hired and June 6, 2014 when Novak was fired by Chief Cavender, older Momence officers over 40, Todd Navrital, Tracy Nolte, Johnny Short and Russell Hoekstra, were subjected to significantly more destructive and hostile

treatment by Chief Cavender compared with younger less experienced Momence officers under the age of 40.  (PAF 42).

43.     Between November 5, 2013 when Cavender was hired and June 6, 2014 when Novak was fired, he observed and heard Chief Cavender intimidate, severely criticize, ridicule, and micromanage older experienced Momence officers, Todd Navrital, Tracy Nolte, Johnny Short and Russell Hoekstra and himself, whereas he did not engage in the same such conduct with younger less experienced Momence officers under the age of 40 including: Benjamin Garcia, Jacob Vekemans, Gabriel Caliendo, Alejandro Morfin, Joshua Rasmussan, and Brandon Miller.  (PAF 43).

44.     Immediately after Chief Cavender was hired, Cavender randomly conducted an internal investigation of Novak, required him to perform a re-do background check, and suspended him. At the same time, Chief Cavender hired Jacob Vekemans, who was in his early 20's.   (PAF 44).

45.     Sometime later in May or June 2014, other police officers told Novak that they heard he was fired.  Novak had heard nothing.  Within a few days, Novak received a letter [from Cavender] stating that his employment was terminated with no explanation given.  At the time Novak left Momence, he was 45 years of age.  Novak was replaced by a younger, less or no experienced person under 40.  (PAF 45).

46.     Novak was hired by the Grant Park, Illinois police department.  As a Grant Park officer, Novak assisted his chief and another officer with background investigations for officer applicants. (PAF 46).

47.     After Russell Hoekstra was fired from Momence, he applied for an officer position with Grant Park. Novak assisted in his background check. Grant Park wanted to hire Hoekstra.

During the background investigation we received from Momence Chief Cavender a 30-page report containing negative allegations against Russell Hoekstra.  Chief Cavender also notified Novak's chief that Hoekstra was under criminal investigation by the Illinois State Police regarding evidence in his locker.  As a result, Grant Park deferred consideration of Hoekstra. (PAF 47).

48.  *The only thing Cavender fired Hoekstra for was lying during an internal investigation regarding the Garcia photos and nothing else.* (PAF 48).

49.  Garcia's photo is a picture of a police officer sitting in a car with a gun to his right side.   He was in uniform with a firearm.  He posted it on Instagram.  (PAF 49).

50.  Cavender prepared an internal investigation report on Officer Hoekstra (pronunciation) and Officer Benjamin Garcia.   They were investigated for violation of department policies, dissemination of information, department information, outside of the department, conduct unbecoming--three or four charges, but he did not recall specifically.  5). They were investigated for the same fact pattern, for the same concerns.  He investigated them individually. The subject matter was two photographs of Officer Garcia that depicted him sitting in a Momence police car in uniform displaying his service weapon across his chest.  (PAF 50).

51.  It was disseminated to one of the alderpersons, Alderwoman Carrie Navratil.   And they were also shown to Deputy Chief Eric Springer of the Kankakee Community College Police Department, and to Officer Turner with the Kankakee Community College Police Department. (PAF 51).

52.  The photos were inappropriate.  The Officer was sitting in his squad car displaying a handgun across his chest, and there was a caption apparently written on the photo that was read by this alderwoman during a city council meeting, something related to sheep dogs and wolves. Mr. Hoekstra was not in any photo.   Cavender never saw the writing. (PAF 52).

53.     Cavender testified that, during the course of that investigation, Cavender learned from officers Patzschke and Caliendo that Officer Stetson told officers Patzschke and Caliendo that Stetson got the photos on his [Stetson's] phone, and it was apparently posted on Officer Garcia's Instagram account which Stetson had on his Instagram on his phone. (PAF 53).

54.     At the time Cavender investigated, he did not investigate how Instagram works. Other than guessing, Cavender did not know how Stetson would get Garcia's photos on Instagram. (PAF 54).

55.     During the course of my investigation, Officer Caliendo and Officer Patzschke, who represented the Metropolitan Alliance Police as the president and vice president of the union, came to Cavender.  They knew that Officer Garcia was facing potential termination as a result of those photographs.     They were upset by that, and they felt that there was a conspiracy of some sort going on behind the scenes that involved Officer Hoekstra.  Cavender interviewed Officer Stetson and then interviewed Alderwoman (sic) Navratil.  Alderwoman (sic) Navratil told Cavender that when she and her family came home from being gone for the day, there were two photographs folded up in her mailbox and that these photographs depicted [Officer] Garcia holding his handgun sitting in the squad car and that she brought them to the City Council meeting because she thought that was the right thing to do.  Cavender asked her some questions related to those photographs about that particular day and who saw them and if she talked to anyone else about the photographs.  Cavender asked her during my interview if she still had the pictures and if the message on there was handwritten or typewritten, and she said it was handwritten. She told Cavender that she destroyed the photos or got rid of them, or she took them home and burned them.  He did not arrest her or charge her with anything.  There is a photocopy of the photos. (PAF 55).

56.     The only reference that Cavender has to Officer Hoekstra is Cavender's hearsay testimony about what he may have heard from Officer Stetson.  Stetson was never deposed, and the Defendants have not submitted his supporting declaration.  (PAF 56).

57.     Cavender asked Alderwoman (sic) Navrital whether or not she got them from Hoekstra and she denied it.  She told Cavender they were in her mailbox and she did not know where they came from.   Other than what Officer Stetson said Officer Hoekstra told him about what Hoekstra might do, to the day of Cavender's deposition, he has no proof that Hoekstra gave those photos to Alderwoman Navratil.  Officer Hoekstra allegedly told Officer Stetson he was going to do something, so Cavender "assumed he [Hoekstra] did".  (PAF 57).

58.     Hoekstra also denied to Cavender giving photos to Navratil.  (PAF 58).

59.     Cavender testified that he had an audio recording of his interviews with Officers Patzschke, Caliendo and Stetson, Defendants' counsel stated, "We don't have an audio recording", and Cavender then testified that it was not "Then it wasn't. If you don't have it, then it wasn't [recorded]."  Other than the audio recording, the only statements he had were verbal since he thought that he audio recorded those meetings, but that he could be wrong. He did not memorialize them on a legal pad, just in his in his investigation report, but he did not prepare his report while he was sitting with [Officers Patzschke, Caliendo and Stetson].  He prepared his investigation report at a different time. Cavender would have made notes but he threw them out.  Other than [Cavender's hearsay testimony] about what Officer Stetson allegedly told him, Cavender has no other proof that Hoekstra was involved in disseminating the Garcia photos. (PAF 59).

60.     Regarding the incident with Officer's Garcia and Hoekstra's alleged involvement, Officer Hoekstra's employment was terminated, and Officer Garcia was suspended for ten day even though Cavender could have fired Garcia.   He did not fire Officer Garcia because based

upon conjecture and hearsay, and despite the denials of Hoekstra and Councilwoman Navrital, Cavender believed that Officer Hoekstra conspired to make Officer Garcia look bad by turning those photos over to the Navratil family". Cavender has no evidence that Officer Hoekstra or Alderwoman (sic) Navratil posted it on social media.  Cavender only knows that it was disseminated by an alderwoman to the city board during executive session as an employment matter.  Cavender has no proof that it was disseminated by Alderwoman Navratil to anybody other than people in the closed session.  Cavender understands that Officer Garcia posted it on Instagram, a public social media vehicle, correct which means anybody could see it on Instagram who chooses to see it or that's connected with him; and that is true public disclosure.  Cavender agrees that Alderwoman Navratil's disclosure was in an executive session, not open to the public; whereas, Garcia's posting of the photo was posted to the public. Cavender believes that Alderwoman Navratil told him that she herself also saw it on social media and in her mailbox, but she *never* used Hoekstra's name when she said both of those statements.   He did not fire Officer Garcia.  He fired Officer Hoekstra because [Hoekstra allegedly "lied during an internal investigation…to [Cavender].  [Hoekstra] allegedly lied to Cavender that Hoekstra did not discuss or show these photographs to anyone outside of our police department.  This is based upon Cavender's hearsay testimony about alleged conversations with and/or statements from Deputy Chief Eric Springer's, Officer Stetson, Officer Caliendo and Officer Patzschke. (PAF 60).

When asked what Hoekstra should have done with those photos if he saw them, Cavender testified that Hoekstra should have reported them to his supervisor, Officer Caliendo who was the Officer in charge. By chain of command in the department, if Hoekstra [had the photos] and was not going to bring them to Cavender, Hoekstra should have taken them to his most immediate-ranked supervisor, which would have been Lieutenant Vekemans.  (PAF 60).

Officer Stetson told Cavender that he had seen the photos on Instagram and that he had counseled Officer Garcia about that as a fellow Officer that was not a bright idea, and he also reported it to Officer Caliendo, who would have been the Officer in charge. Cavender testified that Caliendo told him that Officer Stetson saw the photos on social media. Officer Caliendo reported it to Lieutenant Jacob Vekemans.  Lieutenant Vekemans counseled Officer Garcia, and the pictures had been taken down, and that was going to be the end of it, and Cavender at that point I didn't know anything about them.   At the time Lieutenant Vekemans counseled Officer Garcia about the photos, Vekemans never reported it to Cavender.  Vekemans later told Cavender that he knew about it and told Garcia to get rid of them. Cavender said nothing because they were gone, and he was fine with that.  (PAF 60)

Cavender agreed that Officer Garcia embarrassed the department. (PAF 60).

61.     Hoekstra testified that approximately a couple of weeks before September 27, 2015, he heard Officers Patzschke and Stetson with whom he was working with talking about a photograph posted on Instagram. They said it was not good.  They showed him the photo on Stetson's cell phone and both said it was a very stupid picture and that Garcia needs to be told not to do this.  As a group they decided together that they were going to go through their chain of command, to their officer in charge, who was Officer Caliendo.  They did so within 24 hours of seeing that post.  As patrol officers, their direct report would be to Caliendo as office in charge of "OIC".  They just showed him the picture right off the bat. He said some expletives. He also was not happy also, and then he said, "I will talk to Ben [Garcia]".  (PAF 61).

62.     Hoekstra participated in Cavender's investigatory interview about the inappropriate photos posted by Officer Benjamin Garcia. Quickly, the interview changed from Garcia's Instagram posted photo of him in his Momence uniform with a handgun across his chest saying some tough talk to whether I gave the photos to Alderwoman Carrie Navratil.  He stated he was not happy that the department and he was embarrassed about Navratil having the photo and

showing it to the city council without his knowledge. That was his main focus, and his tone was angry.  Hoekstra felt Cavender wanted him to admit it as a setup.  Hoekstra felt like he was being treated as a criminal suspect under interrogation.  Hoekstra repeatedly told Cavender that he did not give any photo to Councilwoman Navrital.  (PAF 62).

63.     It is untrue what officers Gabe Caliendo, Stetson and Patzschke told Cavender that Hoekstra hated Garcia.  It is untrue that Hoekstra made derogatory comments about Officer Garcia in the presence of officers Caliendo or Patzschke.  Hoekstra do not recall ever making derogatory comments about Chief Cavender in the presence of officers Caliendo or Patzschke.  Hoekstra never told officer Caliendo stated that he was going to give photographs of Garcia to a member of the Navratil family.   (PAF 63).

64.     Hoekstra has no recollection of ever telling Officer Turner at Kankakee Community College about the Ben Garcia pictures or that he gave the phots to an elected official.  (PAF 64).

65.     Hoekstra has no recollection of ever telling Officer Turner at Kankakee Community College, "Wouldn't it be funny if the Mayor or an elected official saw those pictures.  That would be hair-raising.  Both him and the chief would be in trouble." (PAF 65).

66.     Mayor Porter was Momence Mayor when he heard that Hoekstra was involved in a police shooter chase incident, and that there was a call for assistance or something, and Momence did not participate. (PAF 66).

67.     Cavender became aware of active shooter incident over the police radio while he was off duty on his way home.  (PAF 67).

68.     Cavender monitored the process for a few minutes, and geographically where he was at a four-way stop intersection, from his left came a sheriff's officer unit through the intersection probably, a hundred miles an hour or just short of it. He was in his police car but did

not engage and offer backup assistance.   At some point when this pursuit was going on, someone from the sheriff's department asked if we could have the Momence officers come in from the north along the railroad tracks after the car that they were chasing had crashed and the driver fled on foot.      The person that was being chased had allegedly been involved in a shooting incident in the City of Kankakee.      He made a cell phone call to Momence officers Officer August LeBeau, the senior officer, and to Officer Josh Malloy.  He called his officers immediately.  (PAF 68).

69.      He knew Hoekstra's voice and call number.  Hoekstra was chasing a car, giving the direction and speed, and other officers were joining in. (PAF 69).

70.      Cavender was aware that the alleged suspect was in a wooded area, and that absolutely if they had the opportunity to have more officers on the scene that would it be beneficial to the officers.  He knew the suspect left his vehicle and was running into the woods.  Cavender He knew they were attempting to secure the perimeter.  (PAF 70).

71.      Cavender read the sheriff's call log knew that in fact the dispatcher attached Momence Officer Malloy to the call.   Multiple countywide dispatchers handle all the municipal departments, Momence, Manteno, Aroma Park, Saint Anne, Grant Park, Herscher, and the county sheriff's department's traffic, and they can all work together. (PAF 71).

72.      Cavender called Momence Officer LeBeau as the senior of the two officers and then called Malloy; they were in separate cars.  Cavender agrees that it is the police officer's job to put themselves at risk. Despite Cavender's cell phone call to Officer Malloy to not engage in the Hoekstra pursuit, Malloy did not clear from the call for another 45 minutes.  Cavender never notified anyone, including the Kankakee dispatcher, other than his own officers that his Momence officers would not engage. (PAF 72).

73.     Sheriff's Corporal Andrew Mackin had worked for the Kankakee County sheriff's office for 13 years at the time of his February 2, 2018 deposition.  He is on the emergency response team, and has been on the major crimes task force, multiple other smaller teams, Illinois Law Enforcement Alarm System. (PAF 73).

74.     Corporal Mackin was caught up in the Hoekstra active shooter police chase at the scene after the chase.  The vehicle involved was in a ditch and he set up a perimeter. When he arrived, there were other officers at the scene maybe five or six.   The county has an intergovernmental agreement or some practice with respect to mutual aid by other jurisdictions. Other jurisdictions should respond to a request for backup from the sheriff's office if they are available.  (PAF 74).

75.     The suspect had run from the scene eastbound into some woods.    Mackin was in charge, setting up the perimeter and looking for the guy that ran.  Not having enough officers increases the likelihood that the bad guy gets away; it would have been nice to have a couple other units.  If a person comes out of the woods and he's got a gun, it would be better if there were two guys there.  (PAF 75).

76.     Mackin was told at a later date that Momence was told not to respond. Mackin noticed during the whole perimeter that usually Momence is down there in a second. Momence helps them out all the time on calls. Mackin remembers thinking that it was a little strange; he did not know why they were not helping them out that day, especially with this, pursuit of a suspect that we think just shot at somebody or actually shot someone, you know. He remembers thinking why they are not down here helping out. Mackin knows Chief Cavender. Mackin has heard Cavender badmouthing some of the Kankakee County guys on their report-writing, how they write horrible reports, things like that. (PAF 76).

77.     This incident was so significant a K9 unit was called from Peotone.  Momence was five miles away.  Peotone was 30 miles away.    Two more people might have lessened the risk.. One more person would have lessened the risk just because of the geography.  At the time Malloy was cleared, they were still at the scene and the suspect had not been caught.  . Just because Mackin may feel unsafe does not mean he does not have to do his job. He still has to look for the guy. (PAF 77).

78.     Cavender did NOT know that Hoekstra was asleep in his police car.. He was told by Officers Caliendo, Officer Stetson and Officer Patzschke. Cavender never saw him sleeping in his car.  Cavender put a GPS tracking device in Hoekstra's assigned car. but did NOT discover that Hoekstra was sleeping at any time; he did not discuss that with Hoekstra.  It had nothing to do with Hoekstra's termination because Hoekstra was only fired for the Garcia photos.  (PAF 78).

79.     In the original EEOC age discrimination charge Hoekstra made a claim of failure to train.  The dates of discrimination are listed from March 2014 through September 29, 2015, the date he was fired. In March 2015, Hoekstra was 46 years of age. (PAF 79).

80.     Cavender kept saying that Hoekstra's reports were terrible, that they needed more training, that they needed more help, and that with the *"younger kids"* or *"younger officers"* he never had a problem with their reports.  (PAF 80).

81.     Cavender was constantly sending Hoekstra's reports back to him to be corrected. That was a serious and dangerous problem, because Hoekstra wrote the reports in his own words and style and Cavender wanted Hoekstra to use Cavender's words and style and actually change the reports.  That would be an issue in the event any of those cases went to court and we had to produce our reports, which it left the door open to question which report was accurate possibly leading to getting them thrown out of court.  (PAF 81).

82.     Officers used Tri-River Training, where all of classes would be free to the group members.  It was an on online catalog.  Officers could go through the catalog and sign up for classes.  Between December 3, 2014 and March September 29, 2015 including between May 28, 2015 through September 29, 2015, there was a slip of paper that Chief Cavender had that we would fill out dates, the time and the course that officers would wish to take, and they would then turn it into – they put it in Cavender's box, because most of the time Hoekstra was working midnights and he would not see Cavender.  Between December 3, 2014 and March September 29, 2015 including between May 28, 20115 through September 29, 2015, regarding classes that Hoekstra requested, he never received any feedback from Chief Cavender; they included interviewing techniques, a DUI refresher course, and drug training.  Younger officers under 30 told Hoekstra they got to take John Reid interviewing techniques, the drug classes including Lieutenant Vekemans, Jacob Patzschke, and Zachary Stetson; and then the drug testing were Gabe Caliendo, Stetson and Patzschke.  Older officers over 40 including Officer Novak told Hoekstra they did not get any feedback from Chief Cavender.   (PAF 82).

83.     Hoekstra continued between March 2014 through September 29, 2015 to ask for the drug training, the DUI refresher training because Chief Cavender pushed DUI's.  Hoekstra wanted more training to do them properly.  Hoekstra stated that they are getting a lot more drugs in Momence.  Hoekstra was not very familiar with very many drugs due to just lack of training.  Hoekstra never got trained.  Other younger officers under 40 received the training during that same time period including Lieutenant Vekemans, Jacob Patzschke, and Zachary Stetson and then the drug testing were Gabe Caliendo, Stetson and Patzschke.  (PAF 83).

84.     Hoekstra continued between March 2014 through September 29, 2015 to ask for the John Reid interrogation training.  Hoekstra never got that but the younger officers under age

30 got the training during the same time period including Lieutenant Vekemans, Jacob Patzschke, and Zachary Stetson, Gabe Caliendo.  (PAF 84).

85.    Different police officers were assigned different vehicles, and they were allowed to take other cars, or get the supervisor's permission. (PAF 85).

86.    When Hoekstra was a part-timer, another part-time Officer Benjamin Garcia, age 24, was allowed to drive the new Tahoes as his assigned car and Hoekstra had to drive the older Ford Crown Vic.  Benjamin Garcia made the comment to Hoekstra one day, "I don't know how I'm getting in the new vehicles and you are stuck in this thing." (PAF 86).

87.    On September 30, 2015, Hoekstra went to the Momence police station at about 3:00 p.m. to return the Momence property to the department and pick up his paycheck, which Lieutenant Vekemans told him that he could pick up his check when he returned his equipment. (PAF 87).

88.    At the time that Hoekstra was fired, he had in his locker uniforms, personal stuff, ticket books, some training things, an evidence kit and some old evidence from prior six to eight years ago because it had been past practice prior to Chief Cavender becoming chief that they did not have a per se evidence room, so a lot of us would keep our evidence in our lockers, so that would be easier access for them to take it to court and take it back.  When Chief Cavender was chief there was never a discussion about a chain-of-custody protocol or any problem with keeping evidence in a case in their own personal locker. (PAF 88).

89.    Hoekstra first found out the Illinois State Police were asked to look into evidence found in your locker was November 5th, 2015 from State Police Sergeant Massey and Inspector Fred Cosgrove when they stopped at Hoekstra's house on that day.  Sergeant Massey stated, "I don't know if you know this or not, but I have to talk to you about something.  Chief Cavender has started a criminal investigation on you, and I need to do the investigation on you." Cosgrove asked

Hoekstra to go in for an interview, which he did at the Illinois State Police headquarters at District 21 in Ashkum, Illinois for about an hour and a half.  It focused upon the evidence that in Hoekstra's locker.  They said that they would look up the cases that he had -- that they had found the evidence with.  They had also wished to talk to the other people that Hoekstra had worked with and confirm that that was past practice. Hoekstra received follow up from the state police by email on January 13, 2016 that the state's attorney from Kankakee County did not wish to pursue charges on him and that I was cleared from [Cavender's allegations of criminal conduct]. (PAF 89).

90.     During Novak's entire time on the Momence police department, Hoekstra and the other officers did not have an evidence person dedicated to logging in and holding evidence. It had been Momence department practice prior Cavender to keep any case evidence in our own lockers for prompt use in any investigations or in court.  After he became chief, Cavender never addressed that to Nolte, or to my knowledge any other officer that was inappropriate because it was Momence police department standard operating procedure and practice.  (PAF 90).

91.     Hoekstra eventually told Novak that he was cleared of all of Chief Cavender's charges including regarding evidence in his locker and the state's attorney would not bring any charges.  He asked if Grant Park would hire him. Novak told Hoekstra that Grant Park hired someone else.  (PAF 91).

92.     Hoekstra was repeatedly criticized by Cavender for his ticket-writing process in comparison to the under 30 officers.  They had an online ticket system where everything was punched in and it would just print the tickets out.  There were times, not very often, when the driver's licenses were used as for the drivers if they had a ticket.  Drivers would say that they had cash for the bond.  Since Hoekstra was taking the cash, he had to note it on the ticket. Hoekstra would mark the right box on the ticket, initial that he changed it and took, for example, $120 U.S.

United States currency as the bond.  Chief Cavender would literally yell at Hoekstra about that process.  (PAF 92).

93.     Cavender sent a letter to the Illinois Department of Employment Security ["IDES"] on April 11th, 2016 opposing Hoekstra's request for unemployment benefits. (Ex. F hereto).  Other than the issue with Officer Garcia's Instagram photo matter referenced in the letter, which was unfounded, none of the other reasons were reason for which Cavender fired Hoekstra.  Unproven with direct non-hearsay evidence are alleged sleeping on duty, the dissemination of departmental information, and disposition of evidence that was not part of that investigation. Ex. A,  pp. 201, Cavender also asked the Illinois State Police to open criminal investigation about Hoekstra about alleged crime evidence found in Hoekstra's locker after Hoekstra was fired.  Hoekstra was cleared by the Kankakee County State's Attorney's Office.  No charges were filed.  (PAF 93).

## ARGUMENT

The Age Discrimination in Employment Act ("the "ADEA") prohibits an employer from discriminating against employees on the basis of age.   Title VII prohibits employers from discriminating against employees on the basis of race.  *Henry v. Jones,* 507 F. 3d 558, 564 (7th Cir. 2007) (citing 42 U.S.C. § 2000e-2(a)(1)).

Both ADEA and Title VII cases may proceed under the "direct" or "indirect" proof methods.  *Pitasi v. Gartner Group, Inc.,* 184 F.3d 709, 714 (7th Cir. 1999); *Henry v. Jones,* 507 F. 3d 558, 564 (7th Cir. 2007) and *Petts v. Rockledge Furniture LLC*, 534 F 3d 715, 720 (7th Cir. 2008).

Under the direct method, direct evidence and/or sufficient circumstantial evidence are "indicators showing what may be the real motivating force for employment decisions," allowing a court to infer intentional discrimination. *Coffman v. Indianapolis Fire Dep't*, 578 F.3d 559, 563

(7th Cir. 2009).  Under the indirect method, the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) four-part burden-shifting framework applies, wherein a plaintiff must show that: "(1) he is a member of a protected class; (2) his job performance met [her employer's] legitimate business expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably than plaintiff." *Coleman v. Donahoe*, 667 F.3d 835, 845 (7th Cir. 2012).  The four-part method has been extended to age discrimination cases. *Robinson*, 23 F.3d at 1162.  Sufficient evidence exists under either method to deny Defendant's motion.

Hoekstra agrees that the court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's …[age] caused the discharge." *Ortiz v. Werner Enters., Inc*., 834 F.3d 760, 765 (7th Cir. 2016), and that "[r]elevant evidence must be considered, and irrelevant evidence disregarded." Irrelevant evidence also includes hearsay evidence, which is the foundation of virtually all Defendants' defenses. Id.

Plaintiff agrees that *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013) cites Defendants' duty on summary judgement: first, establish there is no remaining issues of material fact; and then, second, that the motion should be granted as a matter of law.  Here there either are substantial remaining fact issues, or the facts favor summary judgment for Plaintiff, which the court may grant sue sponte.

Once a plaintiff establishes the *prima facie* case of disparate treatment, the burden of production shifts to the employer to provide a legitimate, non-discriminatory reason for the decision. *Ballance*, 424 F.3d at 617.  If the employer satisfies its burden, then the burden shifts back to the plaintiff to show that the employer's explanation was pretextual. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007).

Hoekstra has presented sufficient evidence under both the direct and indirect method approaches, to demonstrate several genuine issues of material fact. As such, this Court should deny Defendants' motion for summary judgment.

**Continuing violation**

An exception to the 300-day limit applies when the alleged discrimination presents a continuing violation. *See, e.g., Selan v. Kiley*, 969 F.2d 560, 564 (7th Cir. 1992). The continuing violation doctrine can apply in three situations: (1) if an employer makes decisions over time, making it difficult for an employee to "pinpoint" the exact date of discrimination; (2) if the employer has an expressly discriminatory policy; or (3) if the employer's discrete acts create a pattern of ongoing discrimination and at least one such act occurred in the relevant limitations period. *Selan*, 969 F.2d at 565; *see also Tinner v. United Ins. Co. of Am.*, 308 F.3d 697, 707 (7th Cir. 2002).

**Although Hoekstra doesn't need to prove it, he was meeting his employers' "legitimate expectations."**

Hoekstra does not need to prove the "legitimate expectations" prong in his case. The Court in *Flores v. Preferred Technical Group,* 182 F.3d 512 (7th Cir.1999), held that the plaintiff did not have to satisfy the "legitimate expectations" prong of the prima facie case, as the individuals who judged plaintiff's performance were the same individuals Flores accused of discriminating against her. *Id*. at 515; *see also Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 612 n. 3 (7th Cir.2001) ("legitimate expectations" prong of the prima facie test is not necessary to the analysis, where the people judging the plaintiff's performance were the same people she accused of discriminating against her); *Shager v. Upjohn Co.,* 913 F.2d 398 7th Cir.1990) (denying summary judgment where the

alleged performance deficiencies had been greatly exaggerated and that any deficiencies were offset by superior sales figures)).

In the case at bar, Cavender who judged, ranked, and subsequently terminated Hoekstra, is the same individual of whom Hoekstra is accusing of discriminating against him. As such, Hoekstra does not have to satisfy the "legitimate expectations" prong of the prima facie case.

Even if the Court determined that Hoekstra was required to satisfy the "legitimate expectations" prong of his prima facie age-discrimination claim, the Seventh Circuit has held that a plaintiff's detailed refutation of events, which underlie the basis of the company's adverse action against a plaintiff, indicates that the employer may not have honestly relied on its proffered reasons when it made its decision to terminate an employee. *see Bob-Maunuel v. Chipotle Mexican Grill, Inc.,* 12 C 750, 2014 WL 185978 (N.D. Ill. Jan. 15, 2014); *see also Dey v. Colt Const. & Dev. Co.,* 28 F.3d 1446 (7th Cir. 1994); *Komel v. Jewel Cos.,* 874 F.2d 472, 474–75 (7th Cir.1989) ("an employee's denial of specific events which form the basis of the employer's evaluation may be sufficient to create a genuine issue of fact").

Defendants suggest that Hoekstra was not meeting its legitimate expectations. The fact that Hoekstra denies the majority of the incidents, which underlie the basis of Defendants decision to terminate him are sufficient to create a genuine issue of material fact. The Seventh Circuit noted that the courts: "must look at all relevant factors, the number of which depends on the context of the case, which include whether the employees "dealt with the same supervisor" and were "subject to the same standards." More importantly, the Court notes "[i]t is also relevant whether the employees had comparable experience, education and qualifications, provided that the employer took these factors into account when making the personnel decision in question" *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002) (internal citations omitted) (emphasis

supplied). The record demonstrates that Cavender never took Hoekstra's qualifications into consideration. Hoekstra was meeting the employer's expectations at the time he was fired. *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014). All the alleged evidence to suggest otherwise is based upon supposition and hearsay.

Defendants cites *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 428 (1989) for the proposition that an "employee's own perception of his performance is insufficient and does not constitute affirmative evidence which may defeat a motion for summary judgment." (See MSJ p. 26). In fact, in *Weihaupt*, the court found the plaintiff's testimony regarding his performance "meets Weihaupt's burden of establishing that he met the [employer's] legitimate expectations at the time of his demotion" and as a result Weilhaupt had established a prima facie case of age discrimination. *Weihaupt* at 428, (1989). The burden then was on the defendant to articulate a non-discriminatory reason for the [demotion]. *Id*.

 "[T]he employee may demonstrate that the employer's reasons are unworthy of credence through evidence showing (1) that the proffered reason had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge or (3) that they were insufficient to motivate discharge." *Id*. Summary judgment was granted for the defendant because no "positive evaluations from his personnel file, nor statements of independent third parties to the effect that his performance … was adequate, were submitted." *See Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986).

Here, Hoekstra's personnel file is not pointed to as having any negative content. In fact, it contains letter of commendation from Cavender prior to his employment termination. And each of declarants Roger Novak and Tracy Nolte testify to Hoekstra's skill as a police officer. In fact,

after Nolte was fired by Cavender, he joined the City of Grant Park, Illinois police force, which wanted to hire Hoekstra and would have but for Cavender's intercession to block it.

**Hoekstra Can Identify Other Similarly Situated Individuals**

In the usual case a plaintiff must at least show that the comparators (1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008).  All factors exist here.

Notably, in a disparate discipline case, the similarly situated inquiry often hinges on whether co-workers "engaged in comparable rule or policy violations" and received more lenient discipline. *Coleman v. Donahoe,* 667 F.3d 835, 850 (7th Cir. 2012) citing *Naik v. Boehringer Ingelheim Pharms., Inc*., 627 F.3d 596, 600 (7th Cir. 2010). The Supreme Court has made clear that "precise equivalence in culpability between employees is not the ultimate question: as we indicated in McDonnell Douglas, an allegation that other 'employees involved in acts against [the employer] of comparable seriousness'" received more favorable treatment "is adequate to plead an inferential case" of discrimination."  The central question in any employment discrimination case is whether the employer would have taken the same action had the employee been of a different race (age, sex, religion, national origin, etc.) and everything else had remained the same." *Moranski v. General Motors Corp*., 433 F.3d 537 540 (7th Cir. 2005).

Cavender, from the first day that he was hired as Chief through the date that he fired Hoekstra, Cavender's new hires were primarily in their early 20's and some in their 30's; none over 40. Hoekstra heard Cavender refer to those younger officers as the kids.  Former officers

Hoekstra, Nolte and Novak each and all testify about favoritism of younger workers versus older workers.  The facts in the chart of graphically depicts the story.

Cavender's age-related comments, coupled with his other favoritism of younger workers versus older workers suggest that age played a role in Hoekstra's termination. *see Robinson v. PPG Indus., Inc.,* 23 F.3d 1159 (7th Cir. 1994). In determining whether two employees are similarly situated a court must look at all relevant factors, the number of which depends on the context of the case. *Spath v. Hayes Wheels Int'l-In., Inc.,* 211 F.3d 392, 397 (7th Cir. 2000)

**Cavender's Reasons for Terminating Hoekstra are Pretext**

Pretext means more than a mistake on the part of the employer; pretext "means a lie, specifically a phony reason for some action." *Russell v. Acme-Evans Co.,* 51 F.3d 64, 68 (7th Cir.1995). There are two methods of showing pretext: "Pretext may be established directly with evidence that [the employer] was more likely than not motivated by a discriminatory reason, or indirectly by evidence that the employer's explanation is not credible." *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996) Defendants "must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to [Hoekstra] to submit evidence that the employer's explanation is pretextual." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 225 (7th Cir. 2017)

Any evidence that impeaches the employer's explanation may help show pretext. *Reeves v. Sanderson Plumbing Prod., Inc.,* 530 U.S. 133 (2000).  Pretext may be shown in three (3) ways: 1) by showing that the company's reasons have no basis in fact, 2) if they have a basis in fact, by showing that Defendants' reasons were not the real factors motivating the discharge, or 3) if they were factors, by showing that they were jointly insufficient to motivate the discharge.  *La Montagne v. Am. Convenience Prod., Inc.*, 750 F.2d 1405 (7th Cir. 1984); *Balderston v. Fairbanks*

*Morse Engine*, 328 F.3d 309, 323-24 (7th Cir. 2003). Weaknesses, inconsistencies, contradictions or implausibility in Defendant's' proffered reasons may allow a reasonable person to find them unworthy of credence and hence infer that Cavender did not act for the asserted non-discriminatory reasons. *Boumehdi*, 489 F.3d at 792 citing *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 143 (2000).  Furthermore, pretext can be shown where the employer gives one reason at termination but then offers another later (and that one lacks documentation). *Fischer v. Avanade, Inc.*, 519 F.3d 393, 407 (7th Cir. 2008). Hoekstra has offered evidence of suspicious timing and pretext, and that evidence is sufficient to present a genuine issue of fact. *Magyar v. St. Joseph Regional Medical Center*, 544 F.3d 766, 772 (7th Cir.2008).

Defendants admit that Chief Cavender (not a lawyer), in his letter to the IDES trying to block Hoekstra from getting unemployment compensation, identified the alleged supporting decision, *Giglio v. United States*, 405 U.S. 150 (1972), and discussed the obligations of law enforcement agencies and prosecutors to inform the defense of evidence of an officer's untruthfulness in official matters and misconduct if that misconduct is material to the defense and would damage the credibility of the officer-witness. (Defts. Admit, Answer ¶ 365; Ex. F hereto). Giglio was an appeal from a judgment of conviction wherein defense counsel filed.  What this had to due with Hoekstra's unemployment claim requires explanation. Suffice to say that Cavender was trying to pull out all stops, including a misplaced Supreme Court decision, to harm Hoekstra.

Cavender testified that he only fired Hoekstra because Hoekstra allegedly lied to Cavender about whether or not Hoekstra gave Officer Garcia's Instagram photos to Councilwoman Navrital. That claim is fraught with nothing but hearsay, innuendo and supposition; absolutely nothing else. Both Hoekstra and Councilwoman Navrital denied that she got the photos from Hoekstra. Cavender has never had any evidence to the contrary; nor does he now.  It can be inferred that he

was setting up Hoekstra, the only remaining officer over 40 to get fired and totally clean house. All the other reasons contained in the IDES letter (Ex. F hereto) according to Cavender were not used as reasons to fire Hoekstra—Garcia's photos; that's it.  Garcia, the under 30 culprit got suspended, while Hoekstra the over 40 unproved accused got fired.    Thereafter including after this suit was filed, Cavender in further retaliation sought to deny Hoekstra's unemployment claim, initiated an unfounded criminal investigation about Hoekstra, sandbagged Hoekstra his attempt to get post-termination employment with Grant Park, thus defeating and waiving any failure to mitigate damages argument, and withdrew his two police units from supporting Hoekstra' in a suspected shooter vehicle chase.

Evidence of the decisionmaker's discriminatory motive regarding one employment decision may be used as evidence of that decisionmaker's discriminatory motive in making a similar employment decision." *Huff v. UARCO, Inc*., 122 F.3d 374 (7th Cir. 1997) (citing *Burns v. Gadsden State Community College,* 908 F.2d 1512, 1518-19 n. 9 (11th Cir.1990)); *see also Mathewson v. Natl. Automatic Tool Co., Inc*., 807 F.2d 87, 91 (7th Cir. 1986)(ruling that "[a]lthough much of plaintiff's evidence relates to circumstances surrounding his demotion, it is well settled that evidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer).

**Disparate Treatment vs Disparate Impact**

A claim of disparate treatment under the Act turns on the employer's intent, and the "relevant question is whether the employer's adverse employment decision was motivated by the plaintiff's age." *Noreuil v. Peabody Coal Co.*, 96 F.3d 254, 258 (7th Cir. 1996) (citing *Steffen v. Meridian Life Ins. Co.*, 859 F.2d 534, 545 (7th Cir. 1988)). A disparate-impact claim is not concerned with the employer's intent, and instead focuses on whether "a specified employment

practice of the defendant has a disproportionately negative effect on members of the plaintiff's protected class." *Id.* (citing *Vitug v. Multistate Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996)). To support a disparate impact claim, plaintiffs must allege that a "specific, facially neutral employment practice caused a significantly disproportionate adverse impact based on age." *Carson v. Lake Cty., Indiana*, 865 F.3d 526, 536 (7th Cir. 2017) (quoting *Karlo v. Pittsburgh Glass Works, LLC*, 849 F.3d 61, 68 (3d Cir. 2017)) (emphasis omitted). "[I]t is not enough to simply allege that there is a disparate impact on workers or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005).

The same day he hired as an officer Jason Vekemans, age 24.  As the chart hereto included shows, thereafter and through the date of Hoekstra's firing, one officer (Green) over 40 was hired after Hoekstra.  But during the time Cavender was hired and the day after Hoekstra was fired, about 22 months, the entire police force except for Cavender was under 40; with 28 in their 20's. All officers over age 40 were gone. (See, Exhibits I and J hereto).

One officer (Green) over 40 remains after Hoekstra's firing.  Of all other officers, 12 are between 30-39; 28 are under 30. (See, Exhibits I and J hereto). Cavender was hired as Momence Chief on November 5, 2013.

**Officers During Cavender Tenure**

| Employees Over 40 | | | Employees Under 40 | | |
|---|---|---|---|---|---|
| Name | Separation Date | Age Separated | Name | Hire Date | Age Hired |
| | | | Duncan, Brian A. | 11/17/05 | 23 |
| | | | Morfin, Alejandro | 09/04/06 | 24 |
| | | | Miller, Brandon | 09/01/11 | 33 |
| | | | Rasmussan, Joshua | 08/27/12 | 34 |
| | | | Horvat, Zachary | 02/15/13 | 23 |
| | | | Tomopoulos, Thomas | 07/25/13 | 25 |
| | | | Zimmerman, Terry | 08/20/13 | 36 |
| | | | **Cavender, Jeffery** | **11/05/13** | **51** |
| | | | Vekemans, Jacob | 11/05/13 | 24 |
| | | | Apps, Shawn | 01/27/14 | 34 |
| | | | Caliendo, Gabriel | 03/24/14 | 30 |
| Short, Johnnie | 05/30/14 | 58 | | | |
| Novak, Roger | 06/06/14 | 44 | | | |
| Navratil, Raymond T. | 06/23/14 | 43 | | | |
| | | | Marcotte, Adam | 07/02/14 | 28 |
| | | | Stetson, Zachary | 09/17/14 | 24 |
| | | | Patzschke, Jacob | 09/17/14 | 22 |
| | | | Garcia, Benjamin J. | 10/01/14 | 23 |
| | | | Taylor, Kevin | 10/01/14 | 22 |
| | | | Czako, Ignacio | 12/12/14 | 32 |
| | | | Hurley, Jared | 12/17/14 | 29 |
| | | | Richmond, Zachary | 12/17/14 | 37 |
| | | | Snodsmith, Jeffrey | 12/22/14 | 32 |
| Nolte, Tracy B. | 03/21/15 | 55 | | | |
| | | | West, Zarius D. | 04/20/15 | 22 |
| Hall, Daniel | 04/25/15 | 40 | | | |
| | | | Samples, Matthew | 05/12/15 | 27 |
| | | | Corley, Kevin | 07/24/15 | 29 |
| | | | Karl, Charles | 08/09/15 | 22 |
| | | | Yaeger, Ryan | 09/06/15 | 21 |
| Hoekstra, Russell J. | 09/29/15 | 46 | | | |
| | | | LeBeau, August D. | 01/04/16 | 28 |
| | | | Reel, Joshua D. | 03/02/16 | 22 |
| | | | Dimaggio, Dominic | 06/09/16 | 24 |
| | | | Larson, Stephen | 08/22/16 | 29 |
| | | | **Green, Timothy P.** | **08/26/16** | **42** |
| | | | Rourke, Jessica | 09/14/16 | 24 |
| | | | Kelley, Michael | 09/17/16 | 29 |
| | | | Malloy, Joshua | 09/14/16 | 26 |
| | | | Campbell, Randy | 09/28/16 | 32 |
| | | | Wirth, Mark J. | 09/28/16 | 32 |
| | | | *Cavender, Aaron T.* | *12/26/16* | *22* |
| | | | Hess, Nathan C. | 12/26/16 | 22 |
| | | | Bailey, Tyler J. | 12/26/16 | 23 |
| | | | Deckard, Daniel L. | 12/26/16 | 25 |
| | | | Arseneau, Lucas D. | 12/26/16 | 22 |
| | | | Schultz, Eric M. | 01/12/17 | 32 |
| | | | Leone, Patrick A. | 02/03/17 | 37 |

One officer (Green) over 40 remains after Hoekstra's firing. Of all other officers, 12 are between 30-39; 28 are under 30.

**Hoekstra's Retaliation Claim is reasonably related to his EEOC charge**

Defendants also argue that Hoekstra cannot bring this claim because it is outside the scope of the charges of discrimination that plaintiffs filed with the EEOC. A plaintiff may proceed on a

claim not explicitly asserted in an EEOC charge if it is "reasonably be related" to the charge, and "if the claim in the complaint can reasonably be expected to grow out of an investigation of the allegations in the charge." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 920 (7th Cir. 2000) (quoting *Cheek*, 31 F.3d at 500). The disparate-impact claim is reasonably related to the EEOC charges, and the original and second charge contain enough factual allegations from which the claims may be made. They are both noted as "Continuing Action" and state as follows:

**Original:**

I began my employment with Respondent on or around June 24, 2004, as a part-time Patrolman. My most recent position with Respondent was as a full-time Patrolman. From and after March 2014, I was subjected to different terms and conditions of employment than younger employees, including but not limited to, heightened scrutiny (excessive micromanaging), criticism(s) and reprimand(s) for minor flaw(s) and issue(s) that were never before at issue throughout my career, unwarranted and false allegations, denial of training, denial of work opportunities and assignments, different pre-employment processes for the full-time position, and different disciplinary action. In addition, Respondent systematically forced out or terminated the employment of all officers (other than the Chief of Police) over the age of 40 and replaced all or most of them with employees under the age of 40. On or around September 29, 2015, Respondent terminated my employment.

I believe Respondent continuously and systematically discriminated against and harassed me by engaging in the aforementioned conduct, thus creating a hostile work environment.

I believe that I have been discriminated against because of my age, 47, (date of birth: November 5, 1968), in violation of the Age Discrimination in Employment Act of 1990, as amended.

(EEOC Charge, Exhibit G hereto).

**Second Charge Incorporating the language of the original charge:**

I began my employment with Respondent on or around June 24, 2004, as a part-time Patrolman. My most recent position with Respondent was as a full-time Patrolman. From and after March 2014, I was subjected to different terms and conditions of employment than younger employees, including but not limited to, heightened scrutiny (excessive micromanaging), criticism(s) and reprimand(s) for minor flaw(s) and issue(s) that were never before at issue throughout my career, unwarranted and false allegations, denial of training, denial of work opportunities and assignments, different pre-employment processes for the full-time position, and

different disciplinary action. In addition, Respondent systematically forced out or terminated the employment of all officers (other than the Chief of Police) over the age of 40 and replaced all or most of them with employees under the age of 40. On or around September 29, 2015, Respondent terminated my employment.

I believe Respondent continuously and systematically discriminated against and harassed me by engaging in the aforementioned conduct, thus creating a hostile work environment.

I believe that I have been discriminated against because of my age, 47, (date of birth: November 5, 1968), in violation of the Age Discrimination in Employment Act of 1990, as amended.

On or around March 28, 2016 I filed a charge with the EEOC, now known as #440-2016-03294. On or around October 7, 2016 I received a Right to Sue letter. On January 3, 2017 in The United States District Court for the Northern District of Illinois, Easter Division I filed suit. On January 10, 2017, I was called to chase down and apprehend an armed suspect. This suspect had already shot two individuals. The County called two Momence police officers to back up and help me detain the individual. Momence Police Chief Cavender then called the two officers on their cell phones to tell them not to respond. I believe Cavender was retaliating against me for making a claim under ADEA and filing a complaint after receiving an EEOC right to sue letter. This action put my life in danger as I dealt with an armed and dangerous suspect without backup.

(Second EEOC Charge, Exhibit H hereto).

If the court allows Hoekstra's retaliation claim to proceed, the analysis for retaliation claims is the same under Title VII and the ADEA. *Kuhn v. United Airlines*, 63 F. Supp. 3d 796, 801 (N.D. Ill. 2014), aff'd sub nom. *Kuhn v. United Airlines, Inc.*, 640 F. App'x 534 (7th Cir. 2016).

The prohibition against retaliation states, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this Act or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this Act." 42 U.S.C. § 12203. In order to prove a claim of retaliation, the employee must show: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse action; and (3) a causal connection between the two. *Bd. of Trs., Moraine Valley Cmty. Coll., Dist. No. 524*, 795 F.3d 698, 701 (7th Cir. 2015).

Causal connection to Hoekstra's EEOC charge is clear.  According to Corporal Mackin of the Kankakee Sheriff's office who was the supervisor in the vehicle chase, a fleeing alleged shooter of two victims crashed his car while in pursuit by Hoekstra.  He testified that he believed Momence was supervising the search and capture mission.  He needed all cars available—that was the dispatcher's call out.  No one knew that Cavender had secretly pulled his two units out of the hunt. Cavender and Mackin both testified that Momence is part of the county wide mutual support system and locked into the same Kankakee sheriff dispatcher. Cavender deliberately, dangerously and vindictively substituted himself for Mackin in violation for the policy. Cavender knew it was Hoekstar's pursuit.  The policy states that the pursuing office is in charge of the chase unless overridden by his boo who was OT Cavender, the presumed long-trained and experienced police officer.  Cavender could give no explanation other than he did not want to put his officers in harm's way.  According to Mackin, that is what offers are supposed to do. It made the situation more dangerous for the responding units and the public at large.

According to the Illinois State Police Pursuit Manual (Exhibit K hereto), of which the court is asked to take judicial notice; and states in part:

**PURPOSE**
The purpose of the police pursuit guidelines is to provide a common set of standards for
- police agencies and their officers (to follow) throughout the State of Illinois. These
- guidelines are intended to help reduce the number of collision injuries and fatalities
- associated with pursuits within the state.
- Primary Unit: The police vehicle that initiates a pursuit or any unit that assumes control of the pursuit as the lead vehicle (the first police vehicle immediately behind the
- fleeing suspect).
- Secondary Unit: Any police vehicle which becomes involved as a backup to the primary
- unit and follows the primary unit at a safe distance.
- A Secondary Unit shall notify the telecommunicator and supervisor, if feasible,
- that they have joined the pursuit.
- Upon notification that a pursuit is in progress, the supervisor shall assume
- responsibility for the monitoring and control of the pursuit as it progresses.

- o In controlling the pursuit, the supervisor shall be responsible for the coordination of the pursuit as follows: directing pursuit or support units into or out of the pursuit; assignment of a Secondary Unit to the pursuit; and ensuring compliance with interjurisdictional pursuit agreements
- o Non-engaged police units are expected to monitor radio transmissions and to position themselves to be of possible assistance.
- o The Primary Unit is responsible for the conduct of the pursuit and in determining whether to continue or discontinue the pursuit unless otherwise directed by a supervisor.

**1983 claims**

For municipal liability under Section 1983, the constitutional violation must be caused by (1) an express municipal policy; (2) a widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with "final policymaking authority." Milestone v. City of Monroe, Wis., 665 F.3d 774, 780 (7th Cir. 2011)

Hoekstra's claims of age discrimination under the ADEA and the Equal Protection Clause are identical in all relevant aspects, see *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013). Here, the § 1983 claim is also based on age discrimination, a claim for which a materially adverse employment action is required. See *Rodgers v. White*, 657 F.3d 511, 517 (7th Cir.2011). Here, Hoekstra has alleged a sufficiently materially adverse employment action, so that his age discrimination and § 1983 claim survive summary judgment. *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013).  Hoekstra has alleged and offered facts "*that might plausibly support*" the discriminatory intent link. *Stone v. Bd. of Trustees of N. Illinois Univ.*, 38 F. Supp. 3d 935, 948 (N.D. Ill. 2014), quoting *Sung Park v. Ind. Univ. Sch. of Dentistry*, 692 F.3d 828, 832–33 (7th Cir. 2012).

Based upon the aforesaid authority, the Section 1983 analysis including the factual analysis and the ADEA are identical and require addiotnal response.

**Retaliatory discharge**

43

The tort of retaliatory discharge under Illinois common law can be established if a plaintiff shows that (1) he has been discharged; (2) in retaliation for his activities; and (3) the discharge violates a clear mandate of public policy. *Thomas v. Guardsmark, LLC*, 487 F.3d 531, 535–36 (7th Cir. 2007) *citing Zimmerman v. Buchheit of Sparta, Inc*., 164 Ill.2d 29, 645 N.E.2d 877, 881 (Ill. 1995).

Illinois courts have identified two situations in which the "clear mandate of public policy" standard is met: (1) when an employee is fired for asserting a workers' compensation claim, [citation omitted]; and (2) when an employee is fired for refusing to engage in illegal conduct or reporting the illegal conduct of others (**"whistle blowing"** or "citizen crime fighting"). *Brandon v. Anesthesia & Pain Mgmt. Assocs., Ltd*., 277 F.3d 936, 941 (7th Cir. 2002). In order to state a valid retaliatory-discharge cause of action, the plaintiff must allege that he was discharged in retaliation for his activities and that his discharge violates a clear mandate of public policy. *Palmateer v. International Harvester Co.*, 85 Ill.2d 124, 134, (1981) "The foundation of the tort of retaliatory discharge lies in the protection of public policy, and there is a clear public policy favoring investigation and prosecution of criminal offenses." *Id* at 133.

Defendnats' chief argument is that Hoekstra is not a whistleblower because he said he did not provide the photos to Councilwoman Navrital. Defendants provide a narrow factual view. Hoekstra along with two other officers reported Officer Garcia's misconduct to the Officer in Charge; they were whistleblowers. It was then reported up the chain. Councilwoman Navrital got ahold of the photos and showed them to the city council in executive session—another whistleblower. Chief Cavender was angry at Hoekstra because Navatril brought it to the council's attention which is her right, but which surprised Cavender. He testified that he was angry because

44

it cast a bad light on the police department. It can be inferred that he really meant it cast a bad light on his own reputation. Cavender identified the violated police department's public policy justifying termination. See *Turner v. Mem'l Med. Ctr.*, 233 Ill. 2d 494, 503, 911 N.E.2d 369, 376 (2009) ("unless an employee at will identifies a "specific" expression of public policy, the employee may be discharged with or without cause"). Cavender suspended Officer Garcia for violating department and city policy.

When Cavender accused Hoekstra of "whistleblowing" to Navrital, both Hoekstra and Navrital bot denied it, but that is not a significant factor when the decision to fire Hoexter is in the eyes of Cavender. Cavender fired Hoekstra for alleged lying. He accuses Hoekstra of whistleblowing and fired him for lying that he was not a whistleblower. Now Cavender argues in this motion that because Hoekstra says he was not a whistleblower there can be no liability for firing a whistleblower even though Cavender has never denied that he believes Hoekstra was th whistleblower. This is nothing but self-serving connivance, while ignoring the factual record.

With regard to law enforcement officers, Illinois courts have held that "as the guardians of our laws, police officers are expected to act with integrity, honesty, and trustworthiness." *Bradford v. Vill. of Lombard*, No. 11 C 37, 2014 WL 497677, at *15 (N.D. Ill. Feb. 7, 2014) quoting *Sindermann v. Civil Service Comm'n*, 275 Ill.App.3d 917, 928 (1995). Defendants cite an officer's violation of a single rule has long been held to be a sufficient basis for termination." *Siwek v. Police Bd. of City of Chicago*, 374 Ill. App. 3d 735, 738 (1st Dist. 2007). But in *Siwek,* the plaintiff was on medical leave from her job at the Chicago Police Department and violated a general order that police officers do not engage in secondary employment while on medical leave when she took

a part time job working as a security guard at the Chicago Board of Education. Here there is no violation of a rule, or at least an issue of fact whether or not there was a violation.

While, courts recognize that cause for discharge exists where a police officer lied to his employer (*Sindermann*, 275 Ill.App.3d at 928–29; *Nelmark v. Board of Fire and Police Com'rs of City of DeKalb*, 159 Ill.App.3d 751, 759 (1987), here there is no proven lie.  On the contrary the alleged lied is disputed by several alleged involved parties while the younger officer responsible for the misconduct did not lose his job.

June 2, 2015 was 300 days before Hoekstra's original EEOC Charge filed on March 28, 2016.  At that moment, Hoekstra was the only remining officer over 40.  He was fired on September 29, 2015.  There is no timing issue raised as to the January 23, 2017 Second Continuing Action EEOC Charge filing.

## CONCLUSION

Hoekstra has provided specific facts demonstrating either a genuine fact issue or that the facts support summary judgement for plaintiff. *Carroll v. Lynch*, 698 F.3d 561, 564 (7th Cir. 2012). *Basith v. Cook Cnty*, 241 F.3d 919, 926 (7th Cir. 2001)

>**RUSSELL HOEKSTRA**
>Plaintiff,
>By:      /s/ Nicholas F. Esposito_____
>          One of his attorneys

Nicholas F. Esposito, Atty. # 0755176
Bradley K. Staubus, Atty. # 6230326
ESPOSITO & STAUBUS LLP
7055 Veterans Blvd., Unit B
Burr Ridge, IL 60527
(312) 346-2766


## CERTIFICATE OF SERVICE

I, Nicholas F. Esposito, an attorney, hereby certify that I have filed the aforementioned document via Electronic Case Filing with the United States Central District of Illinois which sent notification to all counsel of record on this 19th day of November 2018.

/s/ Nicholas F. Esposito
One of Plaintiff's attorneys